UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORLY HABER,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>RELIANCE STANDARD LIFE INSURANCE COMPANY,<br><br>　　　　　　Defendant. | Case No. CV 14-9566- MWF (MANx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiff Orly Haber brings this action against Defendant Reliance Standard Life Insurance Company for recovery of long-term disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). This matter came on for trial before the Court sitting without a jury on April 5, 2016. The parties did not present any additional evidence at trial but argued from the Administrative Record and supplemental evidence filed with the Court. The Court admitted the Administrative Record and Exhibit

1 to the Declaration of Robert F. Keehn in Support of Plaintiff's Initial Trial Brief (Docket No. 21). Following the parties' arguments, the Court took the matter under submission.

Having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law under Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I. FINDINGS OF FACT

1. Plaintiff Orly Haber is an individual and citizen of the State of California.

2. Defendant Reliance Standard is a corporation duly organized and existing pursuant to the laws of the State of Illinois with its principal place of business located in Philadelphia, Pennsylvania.

### A. Haber's Employment

3. Between 2000 and 2011, Haber worked as a salesperson for Neiman Marcus ("NM"). Haber's work required a certain level of physical exertion, including being able to continuously stand and walk for approximately 67–100% of the time.

4. As an NM employee, Haber was insured as a member of a group short-term disability ("STD") policy as well as group long-term disability policy ("LTD Policy").

### B. The LTD Policy

5. Under the LTD Policy, Reliance Standard pays a monthly benefit to "an [insured employee who] (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submitted satisfactory proof of Total Disability."

6. For Class 2 employees like Haber, the Policy considers an insured employee "Totally Disabled" if s/he "cannot perform the material duties of his/her Regular Occupation" "during the Elimination Period and for the first 24 months for which a

Monthly Benefit is payable." The Policy has a 180-day Elimination Period. An employee's "Regular Occupation" is "the occupation the [employee] is routinely performing when Total Disability begins." The first 24 months for which a Monthly Benefit is payable is known as the "Regular Occupation" period of the LTD Policy.

7. After the Regular Occupation period, the Policy considers an insured employee "Totally Disabled" if the employee "cannot perform the material duties of Any Occupation." "Any Occupation" is defined as "an occupation normally performed in the national economy for which [the employee] is reasonably suited based upon his/her education, training or experience." The period following the Regular Occupation period is known as the "Any Occupation" period of the LTD Policy.

### C.  Haber's History of Illness, Medical Treatment, and Disability Claims

8. In January 2011, Haber stopped working at NM. She submitted a claim for STD benefits based on reported symptoms of neck, shoulder, and back pain.

9. That same month, Haber complained of back pain to her primary physician, Dr. Amanuel Sima. Dr. Sima referred Haber to physical therapy and ordered an MRI of Haber's lumbar spine. The MRI came back normal. Dr. Sima extended Haber's time off from work, ordered her to continue with physical therapy, and referred her to Dr. Neel Anand, a spine surgeon who recommended surgery to the cervical spine.

10. Between February and April 2011, Haber continued seeing Dr. Sima and reported continued pain in her neck, back, and arm, as well as associated numbness in her arms. Dr. Sima's records consistently reported that a physical examination of Haber revealed "upper extremity numbness with neck [range of motion]."

11. In June 2011, Haber underwent cervical spine surgery.

12. Following the surgery, Haber's STD claim was approved and paid through the maximum 180-day STD period, from January 2011 through July 2011.

13. In the months immediately following the surgery, Haber continued to see Dr. Sima and complain of pain in her neck, back, and arm, as well as associated numbness in her

arms. Dr. Sima's records beginning June 2011 and through April 2013, however, no longer reported any upper extremity numbness revealed by a physical examination. Dr. Sima's August 2011 records also indicated that he expected Haber to make a "full recovery" in less than 12 months.

14. In August 2011, Haber submitted a claim for LTD benefits based on the reported pain in her back, shoulder, neck, arms, and hands.

15. Between August 2011 and May 2012, Dr. Sima's records indicated that Haber's "Chief Complaint" was limited to persistent neck and upper back pain. Between September 2011 and March 2012, Dr. Sima's records indicated that Haber herself denied "any upper extremity weakness."

16. In March 2012, Reliance Standard notified Haber that her LTD claim had been approved and that she would receive LTD benefits beginning (retroactively) July 2011. Haber's LTD benefits were thus paid under the policy's "Regular Occupation" 24-month period of disability, from July 2011 to July 2013. Reliance Standard explained that Haber would reach the end of the 24-month Regular Occupation period in July 2013, before which Defendant would begin to investigate Haber's continued eligibility for LTD benefits as "Totally Disabled" during the Any Occupation period.

17. Between April and December 2012, Haber also saw Dr. Mark Ganjianpour for an initial and then later follow-up orthopedic evaluation for complaints of pain in her knees and neck. According to Dr. Ganjianpour's records, Haber complained of pain in her arms, elbows, and hands, among other complaints. Following an EMG and MRI, Dr. Ganjianpour's notes indicated that, although it is possible Haber suffers from "right hand cubital tunnel syndrome" and/or "bilateral hands carpal tunnel syndrome," signs of neither were supported by EMG results. In December 2012, Dr. Ganjianpour recommended that Haber follow up with a pain management specialist and neurosurgeon, but Haber did not follow up with any of these specialists.

18. Between May 2012 and January 2013, Dr. Sima's records indicated that Haber's "Chief Complaint" was limited to headaches.

19. In July 2012, Haber was involved in a car accident, which exacerbated her symptoms and pain intensity.

20. Following the car accident, Haber also saw Dr. Cynthia Lynn Chabay for a neurological consultation in August 2012 and then a reevaluation in October 2012. Dr. Chabay's notes indicated that Haber complained of "diffuse pain with palpation of the upper extremities" as well as pain radiating into both arms with numbness, "tingling," and even "burning" in both hands. Although Dr. Chabay referred Haber to an additional EMG study of the upper extremities and instructed Haber to return in four to six weeks, Haber neither underwent the EMG study nor returned to see Dr. Chabay.

21. In April 2013, Haber again saw Dr. Sima. Dr. Sima's records from the visit did not include any complaints of upper extremity weakness or pain. In fact, Haber's "Chief Complaint" was limited to increased headaches, total body pain, coughing, wheezing, and dyspnea. Dr. Sima's notes indicated that he suspected that "the patient has toxic/chemical/mold exposure at home" because Haber and her daughter "have identical symptoms."

### D. Reliance Standard's Termination Decision

22. In August 2013, Reliance Standard announced its decision to terminate Haber's LTD benefits as of July 13, 2013. Although Reliance Standard acknowledged that Haber was precluded from performing her Regular Occupation, Haber's medical records did not demonstrate that Haber could not work at other sedentary jobs as long as she was provided time to stand and stretch. Because Haber was not precluded from working in Any Occupation, according to Reliance Standard, she was not "Totally Disabled" within the meaning of the LTD Policy after the conclusion of the 24-month Regular Occupation period.

23. Reliance Standard identified five alternative occupations that would meet Haber's sedentary work requirements: (1) Telephone Sales Representative, (2) Food Checker, (3) Information Clerk, (4) Order Clerk, (5) Order Clerk, Food and Beverage (the "Five Alternative Occupations").

24. Of the Five Alternative Occupations, as defined in the Dictionary of Occupational Titles ("DOT"), all but "Information Clerk" would require "frequent fingering," such as keyboarding or working primarily with fingers rather than the whole arm or hand.

25. These Five Alternative Occupations would also require between one to six months of "Specific Vocational Preparation" ("SVP").

### E. Haber's Appeal

26. In February 2014, Haber appealed the termination decision.

27. At the time of the appeal, the last time Haber saw Dr. Sima was April 2013. The last time Haber saw any specialist was December 2012.

28. Although Reliance Standard requested Haber and her treating physicians for updated medical records to support Haber's appeal, neither Haber nor her treating physicians responded with updated medical records. Therefore, none of the evidence on appeal contained any medical records from Dr. Sima that post-dated April 2013 or other doctors that post-dated December 2012.

29. As a part of the appeal, Reliance Standard arranged for Haber to be examined by an independent medical examiner, Dr. A. Michael Moheimani. The independent medical examination ("IME") occurred in June 2014 and took approximately 40 minutes to complete.

30. Dr. Moheimani's findings concluded that Haber was capable of doing sedentary work activities eight hours a day, five days a week. Dr. Moheimani recorded Haber's complaints regarding her upper extremity pain but noted that "[e]xamination however is normal with normal motor and sensory examination and normal reflexes." He further

noted that although Haber complained of these symptoms, his examination did not support these subjective complaints.

31. As a part of the evaluation, Reliance Standard instructed Dr. Moheimani to complete a "Physical Capacities Questionnaire" ("PCQ"). The PCQ signed by Dr. Moheimani indicated that Haber was only capable of "reach[ing] at waist/desk level" for less than 33% of an eight-hour workday.

32. In September 2014, Reliance Standard rejected Haber's appeal, citing in part to Dr. Moheimani's conclusion that Haber was capable of performing sedentary work.

33. In its Conclusions of Law, the Court weighs the evidence and makes credibility findings. Although discussed below as reasons for the ultimate conclusions of law, the Court's factual conclusions (such as Paragraphs 43–45) are, of course, findings of fact.

## II. CONCLUSIONS OF LAW

### A. Standard of Review

34. The Court reviews challenges to ERISA decisions to deny or terminate benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981 (9th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Here, the parties agree that the *de novo* standard of review applies.

35. When review is *de novo*, "the [C]ourt . . . determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt. Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010). "[T]he [C]ourt 'can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.'" *Armani v. Nw. Mut. Life Ins. Co.*, No. CV 13-7058 RSWL (RZx), 2014 WL 7792524, *8 (C.D. Cal. Nov. 25, 2014) (citation omitted).

36. A plaintiff challenging a benefits decision under 29 U.S.C. § 1132(a)(1)(B) bears the burden of proving entitlement to the benefits by a preponderance of the evidence. *Muniz*, 623 F.3d at 1294.

### B. Haber's Request for Judicial Notice

37. "'[I]n most cases,' only the evidence that was before the plan administrator should be considered." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1084 (9th Cir. 1999) (citation omitted); *see also Polnicky v. Liberty Life Assurance Co. of Boston*, No. 13-CV-01478-SI, 2014 WL 6680725, *7 (N.D. Cal. Nov. 25, 2014) ("In reviewing the plan administrator's decision, the Court has discretion to allow evidence that was not before the plan administrator, but 'only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision . . . .'"). Here, it is undisputed that the plan administrator did not have the benefit of the PCQ in making the decision to terminate LTD benefits. But the parties stipulated at the trial to the admissibility of the PCQ. As the Court stated on the record at trial, the Court **ADMITS** the PCQ.

38. At trial, Haber's counsel also requested the Court take judicial notice of the Occupational Information Network ("O*NET") report on "Receptionists and Information Clerks." Defense counsel did not oppose.

39. Exercising the Court's discretion, the Court **GRANTS** the request and takes judicial notice that the O*NET job description for Information Clerks includes tasks involving keyboarding and computer work. *See Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1125 (C.D. Cal. 2015) ("[W]hen the court is conducting a *de novo* review, it has discretion to review information not in the administrative record."); *Granger v. Life Ins. Co.*, No. 614CV1820ORL41DAB, 2016 WL 2851434, at *11 (M.D. Fla. Mar. 28, 2016) (taking judicial notice of O*NET job descriptions).

///

///

### C. Haber Has Not Proven "Total Disability" Within the Meaning of the LTD Policy.

#### 1. Haber has not met her burden of proving that she is precluded from performing the material duties of the Five Alternative Occupations.

40. Even accepting as true that frequent fingering is a material duty of each of the Five Alternative Occupations, the Court concludes that Haber has failed to carry her burden of proof as the party challenging the termination decision.

41. The crux of the parties' dispute is whether Haber's upper extremity impairment disqualified her from the "frequent fingering," such as frequent keyboarding, required in the Five Alternative Occupations. Haber stakes her appeal primarily on the PCQ, which she argues demonstrates conclusively that she is incapable of reaching at waist or desk level for more than 33% of the work day. (Plaintiff's Reply Brief at 5–7 (Docket No. 22)).

42. In weighing the credibility of Haber's subjective complaints and Dr. Moheimani's conclusions, the Court finds that the PCQ is of limited weight for the following reasons. *See Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989) ("[T]he prospect of receiving disability benefits based on an ailment whose extent is objectively unverifiable provides a strong incentive to falsify or exaggerate . . . . [A]ssessment of the claimant's credibility thus becomes exceptionally important" in such cases.").

43. *First*, given the 40-minute duration of the IME, the information contained in the PCQ is presumably based on Haber's self-reporting to Dr. Moheimani, rather than Dr. Moheimani's observation of Haber's ability to reach at waist or desk level for an entire work day. At the time of the IME, Haber not only had a strong incentive to over-report, she also knew of the Five Alternative Occupations from which she would need to be considered disqualified in order to remain eligible for LTD benefits.

44. *Second*, Dr. Moheimani's report indicated that Haber's subjective complaints exceeded his objective examination findings. Although there is no direct evidence of

malingering, the Court finds Dr. Moheimani's conclusions to be more credible given the independent nature of his evaluation.

45. The Court is not obligated to accept Haber's subjective complaints at face value, especially not after they have been cast into doubt by an independent medical examiner. *See Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1191 (C.D. Cal. 2008) ("Plaintiff claims that his subjective complaints should be accepted at face value. The rule is to the contrary."); *Bratton v. Metro. Life Ins. Co.*, 439 F. Supp. 2d 1039, 1052 (C.D. Cal. 2006) ("[T]he Court agrees with Defendants that a finding of disability based on mere subjective complaints would open the Plan up to malingering and would greatly hamper MetLife from exercising its fiduciary role of scrutinizing requests for benefits.").

46. After carefully weighing the credibility of Haber and Dr. Moheimani, contrary to Haber's contention, the Court does not find that the PCQ alone conclusively establishes that Haber is precluded from the frequent fingering required in the Five Alternative Occupations. Aside from Haber's subjective complaints, however, Haber has not pointed the Court to any objective findings in the record that corroborate her alleged degree of upper extremity impairment.

47. To be clear, the Court does not doubt that Haber suffered or even continues to suffer some degree of pain or numbness in her upper extremities. This much is supported by Haber's consistent complaints to her treating physicians well before the termination decision, for example, between January and September 2011 to Dr. Sima, between August and October 2012 to Dr. Chabay, and between April and December 2012 to Dr. Ganjianpour.

48. What the Court is missing, however, is corroborating evidence for the specific claim that Haber is unable to perform the degree of fingering required in the Five Alternative Occupations. It is this specific finding that the Court cannot make in Haber's favor absent proof by a preponderance of the evidence that the pain or numbness is so debilitating that she is not capable of the frequent fingering required.

49. Setting aside the Court's conclusions regarding the PCQ, the Court's conclusion is further reinforced by Haber's history of medical treatment and records.

50. ***First***, no reports from Haber's treating physicians support her claim that she is unable to perform the frequent fingering required. Indeed, Dr. Sima's records in the fall of 2011 through Haber's last visit in April 2013 suggest that the pain and numbness in her arms and hands had dissipated. Haber's chief complaints during that period were limited to neck pain and headaches. More tellingly, Dr. Sima's records after June 2011 no longer reflected a corroborating finding after physical examination that Haber suffered "upper extremity numbness with neck [range of motion]," which stands in contrast with Dr. Sima's consistent recording of these objective findings between January and June 2011. Furthermore, although Dr. Ganjianpour's records reflected Haber's complaints regarding pain and numbness in her arms and hands between April and December 2012, Dr. Ganjianpour concluded that signs of possible diagnoses such as carpal or cubital tunnel syndrome were not supported by EMG results.

51. ***Second***, Haber's failure to (a) observe recommended follow-up procedures specifically aimed at her upper extremity complaints; and (b) seek continued medical attention after April 2013 are both indicative of the degree of impairment she suffers. For example, although Dr. Chabay referred Haber to a further EMG study of her upper extremities and instructed her to return in four to six weeks, Haber did not comply with either recommendation following her October 2012 visit. Also, as noted in the Court's Findings of Fact, Haber did not seek further medical treatment from Dr. Sima after April 2013 or any specialists after December 2012. In other words, at the time Haber filed her appeal in February 2014, the last time Haber had sought medical treatment for any ailment was nearly a year ago. "Courts discredit a plaintiff's subjective belief that she is disabled if she refuses treatment or is not diligent in following a treatment plan that could alleviate her symptoms." *Shaw*, 144 F. Supp. 3d at 1132 (collecting cases). Here, Haber's failure

1  to comply with recommended follow-up procedures and failure to seek continued medical
2  care undermine her credibility regarding her claimed degree of impairment. *Id.*

3  52. Haber cites *Healy v. Fortis Benefits Insurance Company* for support, but *Healy* is
4  distinguishable. (Plaintiff's Reply Brief at 5 (citing No. 14-CV-00832-RS, 2015 WL
5  5352742, at *1 (N.D. Cal. Sept. 14, 2015))). In *Healy*, the claimant's subjective
6  complaints were corroborated by the objective findings of her treating physicians who
7  had, even at the time of appeal, continued to restrict the claimant from returning full-time
8  to a work environment that required heavy keyboard use. *Healy*, 2015 WL 5352742, at
9  *6. Given the presence of objective medical evidence calling into question the claimant's
10 ability to perform the work in which constant keyboarding would be required, the district
11 court held that the claimant was entitled to reinstatement of her long-term disability
12 benefits. *Id.* Here, no such objective medical evidence exists from Haber's treating
13 physicians. Indeed, at the time Haber first appealed the termination decision, Haber had
14 not sought medical care for nearly a year.

15 53. For the reasons discussed above, the Court finds that Haber has not carried her
16 burden of proving by a preponderance of the evidence that she is physically precluded
17 from performing the frequent fingering required in the Five Alternative Occupations.

### 2. The "present tense wording" of the "Any Occupation" definition does not preclude additional on-the-job training in the Five Alternative Occupations.

54. "Any Occupation" in the LTD Policy is defined as "an occupation normally performed in the national economy for which an insured is reasonably suited based upon his/her education, training or experience."

55. Haber argues that the "present tense" wording of the definition should be interpreted in light of Haber's *current* ability to perform a suitable alternative occupation. (Plaintiff's Opening Brief at 24–25 (Docket No. 20)). According to Haber, this interpretation rules out occupations that require additional training. (*Id.*).

56. The Five Alternative Occupations require between one to six months of SVP. The SVP ratings, however, are only a measure of the *on-the-job training* necessary before an individual becomes proficient at the job. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230 (9th Cir. 2009) ("'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'"). Here, Haber's suggestion that qualifying alternative occupations should not require any on-the-job training or orientation is unrealistic and impractical. The Court also concludes that this argument is unsupported by the plain language of the "Any Occupation" definition.

### 3. Haber's pre-disability salary does not disqualify alternative occupations that pay minimum wage.

57. Haber further argues that her pre-disability annual salary of almost $90,000 should factor into determining what qualifies as an alternative occupation. (Plaintiff's Reply Brief at 11–12). According to Haber, the Court should construe the terms "reasonably suited" in the definition of "Any Occupation" to require consideration of Haber's prior compensation when determining suitable alternative occupations. (*Id.*).

58. The Ninth Circuit has explicitly rejected considering an employee's pre-disability salary when the language of the policy required consideration of "any occupation for which [the employee is] reasonably fitted by training, education, experience, age, and physical or mental capacity." *Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1220 (9th Cir. 2008) (given the plain terms of the policy, the claim administrator did not abuse his discretion in failing to consider the claimant's most recent salary). The Court concludes that *Pannebecker* applies equally to the "Any Occupation" definition here, and Haber does not cite any case law or make any persuasive arguments as to why there should be a legally significant difference between the words "reasonably fitted"

analyzed in *Pannebecker* and "reasonably suited" employed here in the "Any Occupation" definition.

### 4. The alleged procedural irregularities in the appeal do not bear on the Court's *de novo* review.

59. Haber also cites to procedural irregularities in the appeal, such as Reliance Standard's omission of the PCQ in the administrative record. (Plaintiff's Opening Brief at 19–24).

60. These irregularities, however, are not relevant on *de novo* review. *See Hoffmann v. Life Ins. Co. of N. Am.*, No. EDCV 13-2011-JGB, 2014 WL 7525482, *6 (C.D. Cal. Dec. 29, 2014) ("Plaintiff makes numerous and wide-ranging arguments alleging improprieties and procedural mistakes by Defendants [including failure to have plaintiff undergo an independent medical examination]. These would be more relevant if the Court were conducting an abuse of discretion analysis. However, as the Court is conducting a *de novo* review, the focus is on the adequacy of Plaintiff's evidence to support his disability").

## III. VERDICT

The Court **FINDS** and **RULES** that Haber is not entitled to reinstatement of the LTD benefits. Accordingly, the Court's verdict is in favor of Defendant Reliance Standard.

The Court will enter a separate Judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b).

Dated: August 4, 2016

MICHAEL W. FITZGERALD
United States District Judge